# FIRST DISTRICT COURT OF APPEAL
## STATE OF FLORIDA

_____

No. 1D19-3737

_____

VITRO AMERICA, INC.,

Appellant,

v.

MICHAEL T. NGO,

Appellee.

_____

On appeal from the Circuit Court for Santa Rosa County.
Darlene F. Dickey, Judge.

September 21, 2020

JAY, J.

In this personal injury action, Defendant, Vitro America, Inc., appeals a jury verdict and final judgment awarding Plaintiff, Michael T. Ngo, just over $8.2 million in medical and non-economic damages for injuries sustained in a vehicular collision between Mr. Ngo's Suburban and Vitro's truck. At the close of Vitro's case, the trial court directed a partial verdict in favor of Mr. Ngo, finding that Vitro's driver's negligence was a proximate cause of the accident. Because we agree with Vitro that the issue of proximate

cause should have been decided by the jury, we reverse and remand for a new trial.[*]

## I.

### A. The collision.

In the dark hours before dawn on October 10, 2008, Mr. Ngo was traveling along Highway 98 on his usual route to work. At the same time, Michael Turner, a truck driver employed by Vitro, was executing a back-up maneuver to deliver an order of "small glass" to a business located on the same highway. At the time, Mr. Turner was operating an eighteen-wheeled tractor trailer truck. The backing maneuver initially positioned his articulated truck into a jack-knifed posture as Turner wheeled the trailer around at a near ninety-degree angle to the cab and backed into the business. According to Mr. Turner, the truck's hazard lights were flashing and his headlights and running lights were illuminated throughout the maneuver. In addition, there was reflective tape along the side of the trailer.

While Mr. Turner was backing up, he was checking his mirrors and did not see any vehicles on the highway. But when he steered the truck back around to straighten up the cab and align it with the trailer—thereby causing the cab to block the outside, right lane perpendicular to the road and the flow of traffic—the first thing he saw to his left were the headlights of an oncoming vehicle. Mr. Turner testified that only three seconds elapsed from the moment he first saw the headlights until the vehicle collided into the cab near the front wheel on the driver's side. Mr. Turner did not hear any squealing of brakes and estimated that the vehicle had been traveling between 50 to 60 miles per hour when it impacted his cab.

Mr. Ngo drove that stretch of Highway 98 nearly every day and had never before seen—and did not expect—an eighteen-wheeled tractor trailer backing up in his lane of travel. He maintained that, prior to the collision, he was not distracted, his

---

[*] Our decision to reverse on this point obviates the need to reach Vitro's remaining points on appeal.

low beams were on, his vehicle was on cruise control set at 50 miles per hour—despite the legal limit being 55 miles per hour—there was no natural light, no streetlights, and nothing on the road. As Mr. Ngo described it:

> I looked and . . . all of a sudden, the truck appeared in front of me out of nowhere. It's like a ghost or something. It just pop[ped] out in front. Then when I saw that, I thought I had a few seconds and I tried to veer a little bit, tried to stop it and stomp the brake, but I just . . . couldn't avoid the collision.

Mr. Ngo had been looking down his lane and estimated he had at most two or three seconds before he would collide with the truck. As a result of the high-speed impact, Mr. Ngo suffered extensive injuries—primarily fractures of the bones in his right leg, ankle and heel.

### B. The trial.

In his opening statement to the jury, Vitro's attorney admitted that Mr. Turner was negligent in the manner in which he maneuvered his tractor trailer. That being said, however, he queried:

> But here's what the case is about, who is responsible for the crash and Mr. Ngo's injuries? . . . Was it Mr. Turner, was it Mr. Ngo, or was it both? And that's really the question you-all are going to be answering when you hear the evidence. That's especially important in a case like this because you're going to hear that the reason that Mr. Ngo's injuries are so bad is because he hit the vehicle at such a high speed.

During the presentation of his case, Mr. Ngo's expert, David Stopper, took the stand. Mr. Stopper was an investigator of commercial vehicle accidents. He gained his expertise in that field while working in law enforcement, where he spent the majority of his career involved in truck and traffic enforcement. In addition, he received specialized training at various seats of higher learning, ultimately receiving his certification as an accident reconstructionist. From his investigation, he estimated that Mr.

Ngo was 1400 feet behind a curve in the highway when Mr. Turner began his backing maneuver. At nine seconds out from the collision, he calculated that Mr. Ngo was 660 feet from the point of impact. The cab would have been in his field of vision, but Mr. Stopper had examined the reflective tape on the truck and noted that it was irregular. At a forty-five degree angle on the jack-knifed trailer, the tape would have had less reflectivity and been "relatively ineffective" to reflect approaching headlights. Mr. Stopper agreed that the truck's flashing lights and reflective tape would, at some point, have been within Mr. Ngo's field of vision as he rounded the curve, but theorized that Mr. Ngo would not necessarily have perceived the images he saw as representing a hazard, since the flashers could have been misunderstood as a "turn signal somewhere up the road." Instead, according to Stopper, as the highway straightened out ahead of him, Mr. Ngo would have been unable to "interpret exactly what the movement of [the truck] was in sufficient time to perceive it, and react . . . to the obstacle swinging out into his lane," and it would not have been unusual under the driving conditions for an average driver to experience that type of perceptual conflict. In short, based on the data he had collected, Mr. Stopper opined that Mr. Ngo would have been unable to avoid the collision.

In response to Mr. Stopper's opinion, Vitro called its own expert, Larry Dewberry. Mr. Dewberry was a consulting engineer, licensed in the states of Florida, Georgia, Alabama, and Mississippi. His specialty within the field of engineering was "failure analysis, such as vehicle accident analysis." He testified to having an undergraduate and a master's degree in electrical engineering, a master's degree in mechanical engineering, and a master's degree in fire protection engineering. During his career in professional engineering, Mr. Dewberry had testified as an expert witness in accident reconstruction.

From his investigation of the accident, and relying on Mr. Turner's deposition testimony, Mr. Dewberry determined that the truck's headlights, running lights, and hazard lights were on at the time of the collision. Given the road configuration, he opined that the truck would have been visible from 900 feet away, and, had Mr. Ngo applied his brakes sooner, the accident could have easily been avoided. Specifically, Mr. Dewberry testified that at the 900-

4

foot mark, Mr. Ngo would have had 10.9 seconds to apply his brakes in order to avoid the collision.

Mr. Dewberry also conducted a nighttime simulation of the accident utilizing the same truck, with Mr. Turner reenacting his back-up maneuver. (For safety reasons, the simulation was not conducted at the actual scene.) Mr. Dewberry was in his car, stationed at a point 500 feet from the truck with his low beams on. From that vantage point, he never lost sight of the truck's flashing lights, its taillights, the reflective tape, and, once the cab turned to face frontward, the truck's headlights. His video of the simulation was published to the jury. According to Mr. Dewberry, during the entire simulation—as he drove toward the truck—there was never a point that he could not see a flashing light. Ultimately, he concluded that an "attentive driver" "very easily" could have avoided the collision.

Following Mr. Dewberry's testimony, Vitro rested its case. Forthwith, Mr. Ngo's attorney moved for a partial directed verdict asking the court to find that the admitted negligence of Vitro's driver was also the proximate cause of the accident. Specifically, counsel argued that the uncontroverted evidence demonstrated that "but for that negligence, Mr. Ngo's damages would not have occurred." He was quick to add, however, that there might have been "multiple legal causes" for the accident, so that the ruling would not necessarily be one on comparative fault. In response, Vitro's counsel argued that Mr. Dewberry's testimony created a jury question concerning Mr. Ngo's failure to respond in time. The trial court, however, agreed with Mr. Ngo, ruling: "[T]here is no fact for the jury to decide. It has been unanimous through all of these witnesses[.]" Accordingly, the court granted the motion finding that Vitro's negligence was a proximate cause of the accident.

Straightaway, Vitro's attorney renewed his motion for a directed verdict on both causation and liability, which had been unsuccessfully argued at the close of Mr. Ngo's case. Additionally, he moved for a directed verdict on comparative fault, asserting that the undisputed evidence proved that Mr. Ngo "could and should have taken some evasive action to avoid the accident," leaving for the jury only the potential question of apportioning

5

fault between the two parties. The trial court ruled that a jury question remained; that there was the *factual issue* "of perception and visual clutter [and] if the jury believed everything [Mr. Ngo's expert] witness said, then they could find against the defendant[.]" Highlighting the incongruity between the court's ruling that there was no factual issue on the question of proximate causation as to Vitro yet there remained a factual question regarding Mr. Ngo's involvement in causing the collision, the court confirmed that its ruling on Mr. Ngo's motion for directed verdict in no way precluded the jury from assigning him 100% of the comparative fault.

Ultimately, the jury returned its verdict. On the special interrogatory verdict form, it was asked to find if Mr. Ngo was negligent. It found that he was. It then apportioned fault, finding Vitro was 99% at fault, and Mr. Ngo was 1% at fault. It awarded Mr. Ngo $215,218.30 for past and future medical expenses, $1.5 million for past pain and suffering, and $6.5 million for future pain and suffering, for a total award of $8,215,218.30.

Vitro's post-trial motions for a new trial and for remittitur or, in the alternative, for a new trial on damages, were denied. This appeal followed.

## II. Analysis.

Rarely are motions for directed verdicts appropriate in negligence cases. *Harris v. Gandy*, 18 So. 3d 569, 571 (Fla. 1st DCA 2009) (quoting *Howell v. Winkle*, 866 So. 2d 192, 195 (Fla. 1st DCA 2004)); *see also Petroleum Carrier Corp. v. Gates*, 330 So. 2d 751, 752 (Fla. 1st DCA 1976) ("We do not here express an opinion as to whether a directed verdict should [e]ver be granted where the negligence of both parties is at issue. We do, however, believe that such cases will be extremely rare.") A ruling on a motion for directed verdict is reviewed de novo, "reading the evidence and inferences of fact in a light most favorable to the non-moving party." *Philip Morris USA Inc. v. Allen*, 116 So. 3d 467, 469 (Fla. 1st DCA 2013) (citing *Morales v. Weil*, 44 So. 3d 173, 178 (Fla. 4th DCA 2010)). As we elaborated in *Allen*:

In other words, a trial court should grant a motion for directed verdict only "when the evidence, viewed in the light most favorable to the non-moving party, shows that

6

a jury could not reasonably differ about the existence of a material fact and the movant is entitled to judgment as a matter of law." *Meruelo v. Mark Andrew [o]f the Palm Beaches, Ltd.*, 12 So. 3d 247, 250 (Fla. 4th DCA 2009); *see also Kowkabany v. Home Depot, Inc.*, 606 So. 2d 716, 719 (Fla. 1st DCA 1992) ("[I]n reviewing the propriety of a directed verdict, an appellate court must weigh the facts and inferences to be drawn therefrom in the light most favorable to the person against whom judgment has been granted. A directed verdict can be upheld only if there is no evidence or inference from the evidence which will support the non-moving party's position.").

*Id.* at 469.

In *Allen*, we ruled that the trial court erred in directing a verdict in favor of the plaintiff on the issue of the plaintiff's membership in the *Engle* class, by removing the "'addiction causation' requirement from the *Engle* class definition." *Id.* The fact that the jury was subsequently charged on the wholly separate question of comparative fault did not cure the error. This Court reasoned:

[T]he separate questions on comparative fault merely asked the jury to determine who was responsible, and to what degree, for Mrs. Allen's death; but the *Engle* class definition makes addiction *causation a necessary precursor* to the question concerning the degree to which a defendant's alleged misconduct caused a smoker's disease. *Comparative fault in this case focused on an entirely different question.* Therefore, the jury's findings on that subject cannot cure the omission of any jury finding on the crucial addiction causation element.

*Id.* at 473 (emphasis added).

Just as in *Allen*, here, too, the trial court jumped the gun in directing a verdict on the question of proximate causation. Weighing the facts and factual inferences in the light most favorable to Vitro, we conclude that had the jurors been allowed to conduct themselves as the triers of fact on causation, they might have deduced that Mr. Ngo's inattentiveness was the sole

7

proximate cause of the collision. More precisely, Mr. Dewberry's expert opinion—juxtaposed against that of Mr. Spooner—generated such a palpable factual question on who caused the accident that only by conflating causation with comparative negligence was the trial court able to justify directing a verdict on proximate cause. Paradoxically, the trial court reversed course when it denied Vitro's renewed motion for directed verdict by finding that there was a factual dispute created by Mr. Spooner's testimony.

The negligence of *both* parties—from a causation perspective—was irrefutably at issue below. *Petroleum Carrier Corp. v. Gates* underscores the point. In *Gates*, we reversed a directed verdict on liability in favor of the plaintiff driver—whose vehicle had been rear-ended by the defendant truck driver—because it was "axiomatic that a directed verdict should be entered only where the state of the evidence is such that a jury of reasonable men could not reach a contrary result." 330 So. 2d at 752. Specifically, we stated: "Because of the very nature of the comparative negligence doctrine, situations in which directed verdicts will be appropriate will occur with even less frequency, particularly in cases where the plaintiff's own negligence is in issue." *Id.*

Applying those principles to the facts in *Gates*, we reasoned that there was "sufficient evidence from which the jury could have concluded that the *sole proximate cause* of the collision was the inattention of [the plaintiff], or that the *sole proximate cause* of the collision was the failure on the part of [the defendant] to have his vehicle under control, or that both drivers were negligent to some extent." *Id.* at 752 (emphasis added). The very same may be said of the instant case, especially since there was no evidence of any superseding cause of the accident. *Cf. DZE Corp. v. Vickers*, 45 Fla. L. Weekly D1379 (Fla. 1st DCA June 8, 2020) (reversing the trial court's denial of defendant manufacturer's motion for directed verdict, holding that the driver's consumption of a dangerous chemical produced by the manufacturer, and his subsequent impaired driving, was the sole *superseding* proximate cause of the motorists' deaths in the automobile accident between the driver and the motorists, and thus, the manufacturer was not liable to the motorists' estate for its failure to warn).

8

Furthermore, the Fourth District's decision in *R.J. Reynolds Tobacco Co. v. Schlefstein*, 284 So. 3d 584 (Fla. 4th DCA 2019), convinces us that the granting of the partial directed verdict against Vitro denied it of a critical defense. As was *Allen*, *Schlefstein* is another *Engle* progeny case. In *Schlefstein*, the defendant, R.J. Reynolds, appealed an adverse jury verdict, claiming that the trial court "erred in limiting its ability to defend against the decedent's class membership after it withdrew its affirmative defense of comparative negligence." *Id.* at 586. In response to the plaintiff's filing of an amended complaint alleging that the "'*Engle* Phase I findings conclusively established that all of the Defendants were negligent,' and that '[a]s a proximate result of the Defendants' negligence, Plaintiff's Decedent, sustained injuries,'" R.J. Reynolds withdrew its affirmative defense of comparative negligence. *Id.* Before the commencement of the trial, plaintiff's counsel informed the trial court that he intended to present in his opening statement a PowerPoint slide reading: "'Class Membership is Not About:' the 'Fault of either party.'" *Id.* R.J. Reynolds objected, claiming the slide presented an inaccurate statement of the law. Defense counsel argued:

> [I]t is the *plaintiff's burden of proof* to show that addiction was a legal cause of the disease, which means that these other things that they are talking about, her decision to smoke, her desire to smoke was the sole legal cause, then the plaintiff hasn't proven their case on class membership.

*Id.* (emphasis in original). During opening statements, defense counsel had posited that the case was about what caused the deceased's illness, claiming it was not caused by her addiction to cigarettes, but because she enjoyed smoking. Counsel further explained that the withdrawal of their comparative negligence defense "merely removed the allocation of fault question from the verdict form," and therefore it "had no effect on Plaintiff's burden of proving class membership, nor did it limit Reynolds' ability to argue [the deceased] was the sole legal cause of her illness." *Id.* at 587. Ultimately, the trial court ruled that R.J. Reynolds could not "just argue that [the deceased] made a choice to smoke." *Id.* at 588. In return, R.J. Reynolds asserted that the court's ruling "was

9

tantamount to a directed verdict on addiction causation that would be impossible to navigate during trial." *Id.*

Notably, the Fourth District held that "'[c]omparative negligence only has the effect of reducing damages *if liability is established.*'" *Id.* at 590 (emphasis in original) (citation omitted). And it continued: "If the plaintiff was the sole cause of his or her injuries, *the defendant's conduct cannot be the legal cause.*" *Id.* (emphasis added). For this latter proposition, the Fourth District turned to the Florida Supreme Court's seminal decision in *Hoffman v. Jones*, 280 So. 2d 431 (Fla. 1973). *Id.*

In *Hoffman*, upon declaring "that a plaintiff in an action based on negligence will no longer be denied any recovery because of his contributory negligence," *id.* at 438, the supreme court went on to impress:

> This rule should not be construed so as to entitle a person to recover for damage in a case where the proof shows that the defendant could not by the exercise of due care have prevented the injury, or where the defendant's negligence was not a legal cause of the damage. Stated differently, there can be no apportionment of negligence where the negligence of the defendant is not directly a legal cause of the result complained of by the plaintiff. A plaintiff is barred from recovering damages for loss or injury caused by the negligence of another only when the plaintiff's negligence *is the sole legal* cause of the damage, or the negligence of the plaintiff and some person or persons other than the defendant or defendants was the sole legal cause of the damage.

*Id.* (emphasis added).

Likewise, the Fourth District in *Schlefstein* held: "'[W]ithdrawal of the comparative negligence defense [does] not in any way deprive [a defendant] of the right to argue that Plaintiffs' actions were the "sole legal cause" of their own injuries.'" (quoting *Goulah v. Ford Motor Co.*, 118 F.3d 1478, 1485 (11th Cir. 1997) (applying Florida law)). 284 So. 3d at 590.

That analysis applies with equal force to the present case. The substance of Vitro's expert's testimony was that Mr. Ngo was the *sole legal cause* of his injuries. The fact that the jury was charged with finding whether Mr. Ngo was also negligent in order to apportion fault did not cure the trial court's error in directing a verdict that Vitro's driver was—as a matter of law—a legal cause of Mr. Ngo's harm. As was true in *Schlefstein*, the defense of comparative negligence "did not alter" in the first instance Mr. Ngo's "burden of proof" or Vitro's "ability to present evidence to counter it." *Id.* at 590. Instead, the trial court's ruling improperly shifted Mr. Ngo's burden to Vitro, "demonstrably impact[ing]" Vitro's "overall presentation of evidence." *Id.* at 592.

The case law cited by Mr. Ngo does not persuade us to conclude otherwise. For example, in *Perl v. K-Mart Corp.*, 576 So. 2d 412 (Fla. 3d DCA 1991), the Third District agreed with the plaintiff that the trial court had erred in denying her motion for a directed a verdict on the issue of defendant K-Mart's negligence in her slip-and-fall lawsuit. The evidence was irrefutable. All of the witnesses testified that K-Mart's white hangers represented a known hazardous condition when lying, chameleon-like, on the store's white-tiled floors. Furthermore, it was a known store policy that the employees were tasked with the duty of clearing fallen hangers and other floor debris from the aisles to prevent unsuspecting customers from slipping on them. The Third District pointed out that, "[n]otwithstanding this acknowledged obligation, the uncontradicted evidence was that the employee had walked directly over the hanger," after which the plaintiff—who was being escorted by the employee to locate an item—slipped on the hanger and fell, injuring herself. *Id.* at 413. The Third District also observed that while the plaintiff might have been "contributorily negligent," "[a] directed verdict may still lie as against a defendant whose negligent acts are less than the sole proximate cause of an injury." *Id.* at 413-14 (citations omitted). While that observation is pure obiter dictum, it is also internally problematic. In light of the 1973 *Hoffman* decision, the Third District's use of the phrase "*contributorily* negligent" is dated by approximately eighteen years. *Id.* (emphasis added.) Moreover, the dictum appears to suffer the same conflation of legal causation and (correctly) comparative negligence as did the trial court's decision on review. More to the point, in the case at bar, our defendant adduced

11

evidence from which the jury could have found that our plaintiff's actions were the sole proximate cause of his injuries. Accordingly, we conclude that *Perl* is not dispositive but, instead, distinguishable.

Equally distinguishable are the facts in *Maye v. Corderio*, 305 So. 2d 880 (Fla. 1st DCA 1974), in which we held that the trial court erred in *not* directing a verdict as to liability against the defendant trucking company. The evidence in that case was also undisputed. The truck driver made a left-hand turn in front of the plaintiff's car and, realizing he could not clear the highway, maneuvered the truck in such a manner that caused the plaintiff to collide with his front right tire. Furthermore, we noted that the driver "had plead guilty of not having his vehicle under control, and knowing as he did of the hazard of driving at the speed he was driving under the conditions of weather and road, this was undisputed acts of negligence and the court should have so ruled." *Id.* at 881. *See also Proctor & Gamble Distrib. Co. v. McGlamery*, 341 So. 2d 521, 521-22 (Fla. 3d DCA 1976) (affirming summary judgment against the defendant who turned left into the path of oncoming plaintiff's vehicle when his view was blocked by a truck stopped in the oncoming center lane, which driver motioned him to make the turn).

The present case presents an altogether different factual scenario than those in the above-cited cases upon which Mr. Ngo relies. Vitro's expert, Mr. Dewberry, incontestably placed into question whether Mr. Ngo's inattentiveness was the sole cause of his harm, given his statements that Mr. Ngo would have been able to see the truck's flashing lights in time to come to a complete halt and avoid the collision. That evidence created a factual issue on legal causation sufficient to send the question of proximate cause to the jury, notwithstanding any ancillary issue of comparative negligence. Vitro, therefore, is entitled to a new trial.

### III. Conclusion.

Accordingly, we hold that the trial court erred in granting Mr. Ngo's motion for directed verdict. We reverse that ruling and the final judgment, and remand the cause for a new trial on the issue of liability and damages.

REVERSED and REMANDED.

RAY, C.J., and BILBREY, J., concur.

––––––––––––––––––––––––––––––

*Not final until disposition of any timely and authorized motion under Fla. R. App. P. 9.330 or 9.331.*

––––––––––––––––––––––––––––––

Jack R. Reiter and Jonathan L. Gaines of GrayRobinson, P.A., Miami, for Appellant.

Timothy M. O'Brien of Levin, Papantonio, Thomas, Mitchell, Rafferty & Proctor, P.A., Pensacola, for Appellee.

13